UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| HARRISON MANUFACTURING, LLC, | ) |
|                 Counter-Claimant, | ) ) ) |
|         v. | )   Case No. 4:11-cv-00065-TWP-WGH |
| RON BIENIAS, | ) ) ) |
|                 Counter-Defendant. | ) |

**FINDINGS OF FACT AND CONLCUSIONS OF LAW
FOLLOWING BENCH TRIAL JUNE 10, 2013**

This matter was before the Court for a bifurcated bench trial on June 10, 2013, on the sole issue of liability on Counter-Claimant Harrison Manufacturing, LLC's negligent misrepresentation claim against Counter-Defendant Ron Bienias ("Mr. Bienias"). Having heard testimony and considered the exhibits and arguments of both parties, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

**I.   FINDINGS OF FACT**

Child Craft Industries, a business run by the Suvak family since 1911, manufactured children and infant furniture in Southern Indiana. At the height of Child Craft Industries in the 1990s it employed approximately 1,200 workers. Following changes in the industry a devastating flood, in July 2008, Child Craft Industries was sold and acquired by Child Craft, LLC, which is now known as Harrison Manufacturing, LLC ("Child Craft")[1]. Mark Suvak ("Mr. Suvak") was hired by the new owners to serve as Vice President and Chief Operating Officer of Child Craft.

Mr. Bienias is owner and president of JMB Manufacturing, Inc., which does business as Summit Forest Products Company ("Summit"). Mr. Bienias has an extensive work history as it

---

[1] During the trial and in its post-trial briefing, Harrison Manufacturing, LLC referred to itself as "Child Craft"; therefore, for purposes of this entry, the Court will refer to Harrison as Child-Craft.

relates to wood and wood processing, including work as quality control manager, manufacturing manager and plant manager for several furniture manufacturing companies. In the early 1990s, Mr. Bienias formed Summit through which he acts as an independent consultant and broker for furniture manufacturers. Mr. Bienias has a bachelor's degree in forestry, a master's degree in wood technology, and a degree in business.

Prior to 2008, Child Craft Industries and Mr. Bienias had a trusted business relationship. Mr. Suvak—who worked for the predecessor company—was well acquainted with Mr. Bienias. After Child Craft assumed control of Child Craft Industries, Child Craft contracted with Summit, through Mr. Bienias, to secure a manufacturer for Child Craft's new line of high end furniture called the Vogue Line. Child Craft made it clear that it had high quality requirements and an inflexible timeline. Mr. Bienias recommended an Indonesian manufacturer called P.T. Cita. Prior to 2008, Mr. Bienias had some knowledge of P.T. Cita; however, he had not previously done business with them as a source. Mr. Bienias believed that P.T. Cita was a good manufacturer capable of producing conforming goods for Child Craft.

Beginning in August 2008, Child Craft contracted with Summit through Mr. Bienias, by way of a series of purchase orders, to obtain wood sub-assemblies for cribs and case goods from Summit. Child Craft, in turn, would manufacture the unfinished and semi-finished wood products into baby furniture for its Vogue line. Child Craft's contract was with Summit, and in turn, Summit contracted with P.T. Cita to supply the wood product. Mr. Bienias considered himself a broker—"I would sell it to them, and I would purchase it from Cita." At Mr. Bienias's request, Child Craft agreed that they would not have direct contact or sourcing with the supplier, P.T. Cita. Child Craft did not have a direct contract and did not directly communicate with P.T. Cita, except for in September 2008, when Mr. Bienias, Mr. Suvak and Douglas Gessford ("Mr.

2

Gessford") of Child Craft traveled to Indonesia to inspect P.T. Cita and explain Child Craft's specifications.

On August 8, 2008, Child Craft issued its first purchase order to Summit for goods manufactured by P.T. Cita ("PO 1"). PO 1 included a detailed list of specifications for furniture components that Child Craft would need to produce the Vogue line of furniture, including requiring inspections, a quality audit, labeling, and for wood products to have a moisture content in the range of 6-8%. Trial Ex. 8. Summit thus became Child Craft's supplier. P.T. Cita then began manufacturing under PO 1. The order was to consist of furniture components for both cribs and case goods (i.e. accessories such as dressers and night stands). Mr. Bienias understood that manufacture of the cribs was important to the success of the Vogue line.

On November 19, 2008, after the first sea container of PO 1 items had shipped, Summit's independent inspector in Indonesia, Maria, provided Mr. Bienias with the first inspection results of five baby cribs that would be sent in the second sea container. The moisture content of each crib was found to be 16% and there were also surface wood defects. Trial Ex. 33. Mr. Bienias forwarded the results to Mr. Suvak, who responded, "16%!!?? This will never work. What was the first container?" Trial Ex. 33.

On November 22, 2008, Maria emailed Mr. Bienias with inspection results showing the moisture content of nine cribs: two of the cribs had moisture content lower than the 6-8% range, one had moisture content higher than the acceptable range, while the remaining six were within acceptable range. Trial Ex. 38. Also on November 22, 2008, Mr. Bienias emailed Mr. Suvak that, "Core MC [moisture control] readings from Maria's inspector, looks OK to me." Trial Ex. 39. Mr. Suvak testified that he was never informed only nine cribs were tested and that three of

the nine cribs sampled were outside of acceptable range. The second sea container of cribs was then shipped to Child Craft.

On November 24, 2008, because the first sea container did not contain any cribs but only case goods, Child Craft requested that P.T. Cita send 20 cribs via air freight, at P.T. Cita or Summit's cost.

Child Craft received the first sea container on December 11, 2008. The case goods contained within were defective; specifically the case goods had veneer joint, fit, and finishing problems. The first container was inspected by P.T. Cita, but not by Summit's inspector, Maria.

The air shipment of cribs arrived at Child Craft on December 12, 2008. Child Craft measured the moisture content to be at 20% in the cribs, much higher than the acceptable range. The 20 cribs may have been inspected by P.T. Cita, but were not inspected by Summit's inspector, Maria.

On December 15, 2008, Mr. Bienias emailed Mr. Suvak that the moisture content on goods in the third sea container under PO 1, "check out acceptable." Trial Ex. 57.

Because of the moisture content problems in the cribs, Child Craft requested on December 16, 2008, that the second purchase order ("PO 2") should contain goods made of agathis wood, and not white teak as previously specified.

On December 22, 2008, Mr. Bienias emailed that the second container was due to arrive at Child Craft on December 30, 2008, and "we are concerned about the MC [moisture content] so please advise when the container arrives." Trial Ex. 65. The second container arrived on December 30, 2008 and had a moisture content in excess of 20%.

Child Craft received the third container on January 26, 2009. Child Craft measured the moisture content of these goods to be within an unacceptable range between 11-14%. Trial Ex. 80.

On January 13, 2009, Child Craft put a hold on PO 2, because it wanted to wait and see if the next container of cribs was free of defects. On January 18, 2009, Maria emailed Mr. Bienias with an inspection report of 32 cribs of PO 2. The average moisture content was between 13-16%.

On February 4, 2009, Mr. Bienias confirmed to Child Craft that P.T. Cita was holding PO 2, but that moisture content in the cribs was between 6-8%. Further, he stated, "I will have Maria confirm when it is time to ship." Trial Ex. 81. Also on February 4, 2009, Mr. Bienias emailed P.T. Cita and asked what drying method P.T. Cita was using for the wood, and suggested they review the U.S. Forest Products Laboratory's Dry Kiln Operator Manual. On February 8, 2009, Mr. Bienias again emailed P.T. Cita inquiring into the type of probe P.T. Cita was using to test core samples. On February 17, 2009, Mr. Bienias emailed P.T. Cita to pass along that Child Craft was not happy that "the cribs from [the] third container are still at 14% [moisture content] in the core" and the cribs could not be processed. Trial Ex. 91.

On February 20, 2009, Child Craft informed Summit and Mr. Bienias that Child Craft had not received any usable cribs from P.T. Cita and was over two months late in getting the product to customers. Child Craft stated it would not pay for any product until it received useable cribs. Further, it requested a P.T. Cita representative to come to Child Craft, because "Child Craft wants to establish a long term relationship with P.T. Cita." Trial Ex. 93.

On February 27, 2009, Mr. Bienias emailed P.T. Cita stating,

> You have had problems with the moisture content on these cribs and that concerns me since that is the problem. . . . Also, word to the wise, you have a few

5

>days so I would carefully check the cribs, make sure everything is to specification . . . and probably put into dry kiln or whatever you re-dried cribs in for a day or so.  Maria inspector will not, repeat, will not inspect these containers.

Trial Ex. 97.

On February 28, 2009, Mr. Bienias emailed Mr. Gessford stating that 78 cribs were "ready for second PO and cases, that is what will be shipped on this container."  Trial Ex. 101.  Thereafter, two PO 2 sea containers were shipped by P.T. Cita a few days apart, around March 2 or 3, 2009.

On March 5, 2009, Mr. Bienias emailed his attorney in Indonesia that, "the 78 cribs ready to ship were above 14% and they placed in drying room and we have no assurance 6 to 8%, only [P.T. Cita's] word which is not sterling (three shipments of cribs were to be 6 to 8% and were not, so why should we believe them now)?"  Trial Ex. 103.

Child Craft received the first container of PO 2 on April 21, 2009.  Child Craft measured the moisture content of the cribs in the container to be between the unacceptable range of 9.5-11%.  Mr. Suvak described the results as "not great, but a lot better than before."  Trial Ex. 116.  Mr. Bienias emailed Mr. Suvak that he "didn't see an issue" and "don't see a problem because we always dried softwood to 10%."  Trial Ex. 117.  Mr. Bienias was referring to the fact that agathis is softwood, and the "Wood Handbook" states that softwood can be used for furniture with a moisture content of 7-9%, with individual pieces being 6-10%.  Trial Ex. 117.  However, Child Craft's inspection of the shipment revealed the cribs were white teak and not agathis as promised.  P.T. Cita claimed that the shipment was mislabeled as white teak, but the cribs were agathis.  This was proven untrue by Child Craft's inspection and an independent inspection by the Forest Products Laboratory which confirmed the wood was white teak.

The second PO 2 container was received by Child Craft on April 28, 2009. It contained many defects, including damage during shipment, high moisture content, mixed species of wood, veneer bubbling, veneer usage instead of solid wood, and crib spindles not glued. Mr. Bienias testified that Summit's inspectors were inspecting goods before shipment. Yet in an email written May 16, 2011 to his attorney in Indonesia, Mr. Bienias stated that "Maria only inspected raw parts, i.e., parts that were only rough cut. She didn't inspect any machined parts or finished cribs. Cita was to do the inspection because all of the specifications were known by them at the time." Trial Ex. 158. Additionally, on March 9, 2009, Mr. Bienias was told by P.T. Cita that it "won't deliver the goods before it is inspected [in Indonesia]."

Given these statements and the February 27, 2009 and March 5, 2009 emails that Summit's inspectors would not be inspecting the goods, and that Summit and Child Craft only had P.T. Cita's word that the cribs were between 6-8% moisture content, the Court finds that the PO 2 shipments were not fully inspected by Summit. However, Child Craft relied on Mr. Bienias's assurances that goods were ready to be shipped, and thus, the goods were acceptable.

Ultimately, Child Craft did not receive any usable cribs from Summit and P.T. Cita, and did not sell any product under the Vogue Line. Because Child Craft was forced to cancel orders and could not sell any furniture, it used up its remaining operating capital and was forced to cease operations on June 19, 2009.

Child Craft asserts that had it been aware on January 18, 2009, on February 4, 2009, or on February 28, 2009, that Mr. Bienias was not confident that P.T. Cita knew how to dry wood properly and that Summit was not inspecting finished goods under PO 2 prior to shipment, it would have switched to an alternative supplier in Vietnam. However, Child Craft relied on Mr. Bienias's statements and remained with P.T. Cita for PO 2.

## II.  CONCLUSIONS OF LAW

**A.     Motion for Judgment as a Matter of Law**

As an initial matter, the Court **DENIES** Mr. Bienias's Motion for Judgment as a Matter of Law made at the close of trial.  As the Court will discuss below, Child Craft presented sufficient evidence to support the tort of negligent misrepresentation.  Moreover, the economic loss doctrine does not apply to preclude Child Craft's claim.

The economic loss doctrine is implicated when a plaintiff has suffered a purely economic loss due to negligence and applies "to those who a supply a defective product or service pursuant to a contract." *Indianapolis-Marion Cnty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 731, 735 (Ind. 2010).  Indiana has recognized exceptions to the economic loss rule in instances of "lawyer malpractice, breach of a duty of care owed to a plaintiff by a fiduciary, breach of a duty to settle owed by a liability insurer to the insured, and negligent misstatement." *U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742, 746 (Ind. 2010).  Here, the Court finds the economic loss doctrine does not apply.

First, Mr. Bienias was not in privity of contract with Child Craft; Summit—who is no longer a party—was. Second, Child Craft is asserting negligent misrepresentation, a tort recognized as an exception to the economic loss doctrine.  Mr. Bienias argues that the tort of negligent misrepresentation has only been recognized in the limited context of the employer-employee relationship. *See Trytko v. Hubbell*, 28 F.3d 715, 720 (7th Cir. 1994); *Jim Barna Log Sys. Midwest, Inc. v. Gen. Cas. Ins. Co. of Wis.*, 791 N.E.2d 816, 830 (Ind. Ct. App. 2003) ("Indiana courts have held that 'despite the limited recognition of the tort in the context of an employer-employee relationship, Indiana does not recognize the tort of negligent misrepresentation.'" (quoting *Darst v. Ill. Farmers Ins. Co.*, 716 N.E.2d 579, 584 (Ind. Ct. App.

1999))); *Eby v. York-Division, Borg Warner*, 455 N.E.2d 1022, 1025 (Ind. Ct. App. 1983). Yet the Indiana Supreme Court has since explained negligent misrepresentation in broader terms: "A professional may owe a duty to a third party with whom the professional has no contractual relationship, but the professional must have actual knowledge that such third person will rely on his professional opinion." *U.S. Bank*, 929 N.E.2d at 747 (allowing the tort to go forward in the context of title insurance and an advisory relationship). The Indiana Court of Appeals has also recognized that the tort of negligent misrepresentation may be available against so-called "professionals," such as brokers, attorneys, abstractors, and surveyors. *Jeffrey v. Methodist Hosps.*, 956 N.E.2d 151, 156 (Ind. Ct. App. 2011); *see Mart v. Forest River, Inc.*, 854 F. Supp. 2d 577, 595 n.18 (N.D. Ind. 2012) (although describing the tort as limited to the employer-employee context, recognizing that the Indiana Supreme Court has described and the Indiana Court of Appeals has recognized the tort may stand in the professional context).

Here, Mr. Bienias was not in privity of contract with Child Craft and was acting as a professional advising and securing product for Child Craft. In fact, Mr. Bienias refers to himself as a professional broker. The Court finds that this situation is similar enough to the professional relationship at issue in *U.S. Bank* to move forward. Additionally, the claim is not subject to the economic loss doctrine. Therefore, the tort of negligent misrepresentation is available to Child Craft, and the Court will address it on the merits below.

**B.     Negligent Misrepresentation**

In Indiana, a defendant is liable for negligent misrepresentation when four elements are met: (1) the defendant, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions; (2) the defendant fails to exercise reasonable care or

9

competence in obtaining or communicating the information; (3) the plaintiff justifiably relies upon the information supplied by the defendant; and (4) the plaintiff suffers pecuniary loss as a result. *U.S. Bank*, 929 N.E.2d at 747; *see* Restatement (Second) of Torts § 552. The tort does not require intent to deceive. *See* Restatement (Second) of Torts § 552 cmt. a. For Mr. Bienias to be held liable, Child Craft must show that: (1) Mr. Bienias supplied false information in guiding Child Craft in its business transactions; (2) Mr. Bienias failed to exercise reasonable care or competence in obtaining and communicating the information; (3) that Child Craft justifiably relied upon Mr. Bienias's information; and (4) that Child Craft suffered pecuniary loss as a result.

1. **False Statements in the Course of Business**

First, the evidence shows that Mr. Bienias provided guidance and information to Child Craft in the course of his business with Summit, in which he had a pecuniary interest. Second, some of the information supplied to Child Craft by Mr. Bienias in the course of Mr. Bienias's business was false.

Specifically, Mr. Bienias made false statements about the quality of goods being shipped. Before nearly each container of goods was shipped to Child Craft, Mr. Bienias gave assurances to Child Craft that the goods had been inspected and the moisture content of the cribs was between the acceptable range of 6-8%. The Restatement describes the duty under as "failing to exercise reasonable care or competence in supplying *correct information*." Restatement (Second) of Torts § 552, cmt. a. The evidence on the record establishes that the assurances provided by Mr. Bienias to Child Craft proved to be false. In fact, Summit's inspector did not inspect the first sea container under PO 1, nor the first air shipment of cribs. Further, Mr. Bienias told Mr. Suvak that the second shipment was "OK", when only a small portion were

10

sampled and three of the sampled cribs were outside the acceptable range. When the shipment was en route, Mr. Bienias then told Mr. Suvak that he was concerned about the moisture content; when Child Craft received and inspected the shipment, moisture content was found to be in excess of 20%. Again, the third shipment under PO 1 was described by Mr. Bienias as "acceptable," but upon arrival Child Craft found the cribs had a moisture content between 11-14%. Finally, in January and February 2009, Mr. Bienias knew that the first shipment of cribs from PO 2 had a moisture content of 13-16%. Then, on the same day that he emailed Mr. Suvak that the same cribs had a moisture content of 6-8%, he emailed P.T. Cita questioning the drying process used and whether P.T. Cita was capable of properly drying wood. Mr. Bienias had also told Child Craft that Summit's inspector would confirm moisture content readings were acceptable before shipment, but in emails to his attorney in Indonesia and to P.T. Cita, he stated that Summit's inspector would not be inspecting finished goods before shipment. Then he told Child Craft, despite the lack of inspection, that the cribs were ready for shipment. Mr. Bienias never told Child Craft that the cribs had not been inspected by Summit's inspector. Thus, the evidence includes misrepresentations or false statements.

    Mr. Bienias contends that the alleged false statements were merely expressions of his opinion or constituted the relaying of information reasonably obtained by him from P.T. Cita. He argues that statements of opinion cannot constitute false statements of fact. In discussing the elements of fraud in *Darst*, the Indiana Court of Appeals stated that "expressions of opinion are not actionable." 716 N.E.2d at 582 (internal quotation omitted). However, it was not Mr. Bienias's opinion that the goods were inspected, that was a representation of a fact. Further, Mr. Bienias made statements of fact that the moisture content was 6-8%, and his statements that the moisture content was "OK" or acceptable was reasonably relied upon by Child Craft as a

representation that the goods were, in fact, within the acceptable range dictated by specifications. Therefore, the Court finds that Child Craft has established that Mr. Bienias made false statements, that is, he provided incorrect information, in furtherance of the business relationship.

### 2. Failure to Exercise Reasonable Care or Competence in Obtaining or Communicating False Information

The Court finds Mr. Bienias failed to exercise reasonable care or competence when he communicated the false statements to Child Craft. The duty of reasonable care requires a defendant to "conform his conduct to a standard of care arising from his relationship with the plaintiff." *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991). In this case, Mr. Bienias had the duty as supplier and intermediary to provide accurate information to Child Craft. He was required to act as an ordinarily prudent person would act under similar circumstances.

The Court finds that it was unreasonable of Mr. Bienias to assure Child Craft that goods had been inspected and were ready to ship when Summit's independent inspectors had not inspected the goods or had inspected only a small sample. It was unreasonable, especially given the concerns with defects and moisture content, to rely upon P.T. Cita's representations. Summit and Mr. Bienias had an inspector in Indonesia, and the reasonable duty of care required Mr. Bienias to ensure the accuracy of information given to Child Craft. He failed to do so.

It was also unreasonable of Mr. Bienias to assure Child Craft that the shipments under PO 2 were ready and conforming, while simultaneously questioning P.T. Cita's ability to properly dry wood. An ordinarily prudent businessman would have shared his concerns with Child Craft rather than allowing another sea container to be shipped. The Court recognizes that Mr. Bienias did express concerns that P.T. Cita was not being forthcoming, but he still passed along P.T. Cita's information without verifying it with Summit's independent inspectors or expressing his full concerns with Child Craft. Instead, by telling Child Craft that shipments were ready, Mr.

Bienias unreasonably passed along information he himself did not reasonably believe. Therefore, Child Craft has satisfied this factor.

### 3. Justifiable Reliance on False Information

The Court finds that Child Craft justifiably relied upon Mr. Bienias's statements and assurances. Child Craft believed, based upon Mr. Bienias's experience and prior relationship with Child Craft Industries, that P.T. Cita was capable of manufacturing the quality goods required of the Vogue Line. It further relied upon Mr. Bienias's information in January and February 2009, when it chose to continue its relationship with P.T. Cita instead of switching manufacturers. The reliance was justified for several reasons. First, Mr. Bienias has a master's degree in wood technology and has worked in the furniture and wood industries for many years. Child Craft reasonably considered him a wood expert and someone they could rely upon. Second, Mr. Bienias had successfully worked with Child Craft Industries and Mr. Suvak for several years, resulting in a high level of trust and rapport. Child Craft reasonably believed Mr. Bienias would continue quality service and the successful relationship of procuring goods for Child Craft. Finally, Child Craft did not have the same access to the information to determine for itself if P.T. Cita was manufacturing conforming goods until the goods arrived at Child Craft. Indiana courts have found that reliance is not justified when "plaintiffs knew as much about the facts of the underlying transaction as did the person making the misrepresentation." *Jeffrey*, 956 N.E.2d at 157. That rule does not apply here. In this case, the contract between Child Craft and Mr. Bienias contained one restriction – Child Craft was not allowed to communicate directly with C.T. Pita, Mr. Bienias's source. Child Craft justifiably relied on Mr. Bienias, who was in contact with both Summit's inspectors in Indonesia and P.T. Cita directly. Therefore, Child Craft has satisfied this factor.

### 4. Pecuniary Loss

Although the determination of damages has been reserved for a later date, the Court finds that Child Craft has suffered a pecuniary loss as a result of Mr. Bienias's misrepresentations. Had Mr. Bienias accurately relayed P.T. Cita's problems, Summit's lack of inspections, and his concerns to Child Craft, Child Craft could have either reduced its losses by stopping production or switched to its alternative supplier in Vietnam. Instead, Child Craft was faced with insurmountable delays, unusable product, cancelled contracts, and loss of revenue. Ultimately, Child Craft ceased operations as a direct result of the failure of P.T. Cita to manufacture conforming goods. At this stage, this is sufficient to support an inference of pecuniary loss to proceed to the damages portion of this case. Therefore, for the purposes of liability, Child Craft has satisfied this factor.

### III.  CONCLUSION

For the reasons set forth above in the Court's Findings of Fact and Conclusions of Law, the Court finds that Counter-Plaintiff Child Craft, LLC has established the liability of Counter-Defendant Ron Bienias for the tort of negligent misrepresentation under Indiana law.

The matter is set for a hearing on damages on <u>February 14, 2014 at 9:00 a.m.</u> in Courtroom 344, Birch Bayh Federal Building and United States Courthouse, Indianapolis, Indiana.

**SO ORDERED.**

Date:  12/10/2013
_____

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Michael A. Landisman
landismanatty@gmail.com

S. Chad Butcher
schadbutcher@gmail.com

John C. Roach
RANSDELL & ROACH, PLLC
john@ransdellroach.com

S. Chad Meredith
RANSDELL AND ROACH, PLLC
chad@ransdellroach.com

W. Keith Ransdell
RANSDELL AND ROACH, PLLC
keith@ransdellroach.com